UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JOHN SACCHI,<br><br>Plaintiff (**"Buyer"**),<br><br>vs.<br><br>TANU REDDI (**"Seller"**), COMPASS GREATER NY, LLC (**"Broker"**), and ARI J. LeFAUVE (**"Director"**),<br><br>Defendants (collectively, **"Company"**). | **ELECTRONICALLY FILED**<br><br>Hon. Kenneth M. Karas<br><br>No. 7:26-cv-2102-KMK<br><br>**SECOND AMENDED COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

**SERIAL-FRAUDSTER TANU REDDI DEFRAUDED CONSUMER IN SELLING A $5,350,000.00 "BLACK MOLD" INFESTED RESIDENCE BY KNOWINGLY FALSELY DISCLAIMING KNOWLEDGE OF WATER PENETRATION AND DAMAGE THAT SHE COVERED-UP WHILE DEFRAUDING YONKERS OF $31,000.00 ANNUALLY BY KNOWINGLY FALSELY CLAIMING SHE RESIDED IN HER INVESTMENT PROPERTY**

Pursuant to the Order of the Honorable Kenneth M. Karas, U.S.D.J., dated May 26, 2026 (ECF Doc. No. 48), and Judge Karas's Individual Rules, plaintiff John Sacchi (**"Buyer,"** **"Consumer,"** or **"Mr. Sacchi"**) hereby files this second amended complaint in an effort to obviate a motion to dismiss while adding facts that have subsequently transpired or been discovered as ongoing investigation of the extensive water infiltration and damage continues due to Defendants' refusal to provide the knowledge of the

etiology of the damage peculiar to them. See, e.g., **Exhibit 6** (e-mail requesting Defendants to be present during "breaking open" of the home's ceilings and walls). Buyer alleges as follows:

1. Buyer, a citizen of Wyoming, is a male Senior Citizen stroke survivor who at all times herein suffered, and suffers, from ***(i) medically treated respiratory difficulties and (ii) an allergy to mold.***

2. Buyer is an experienced buyer and seller of real property throughout the United States and never previously experienced the fraudulent activity perpetrated by defendants herein. See, e.g., **Exhibit 4** attached hereto (detailing Buyer's extensive and long time experience with buying and selling real property nationally).

3. Serial-fraudster defendant TANU REDDI ("**Seller**" or "**Ms. Reddi**")[1] is a female adult who, upon information and belief, currently resides at 2 Oak Bend, Bronxville, New York and owns property located at 236 S. Hills Road, Clancy, Montana. Upon information and belief, Reddi is a citizen of New York, where she is, *inter alia*, registered to vote in Westchester County. In an abundance of caution and to comply with the Court's May 1, 2026 Order, Buyer made multiple requests to Seller prior to filing the first amended complaint to ascertain whether Seller is a citizen

[1]Consumer contacted Seller prior to the filing and service of the complaints and noted that the action would be dismissed if she provided all relevant information and reimbursed the needed reparative work; Buyer, moreover, would agree to waive any and all punitive damages, attorneys' fees, and statutory damages.

of Wyoming such that complete diversity would not exist and subject matter jurisdiction would consequently be absent herefrom. **Buyer informed Seller that she may be dismissed from the action in the event she indicated she is in fact a Wyoming citizen**, but Seller made no such assertion. In the event Seller were to now indicate she is a Wyoming citizen, Buyer will immediately take action such as dismissing Seller from the action to maintain compliance with the Court's May 1, 2026 Order.

a. **Reddi's Partnership With Compass in <u>Advertising and Selling the Damaged Home</u>**

As freely admitted in Defendant Compass's on-line FaceBook video advertisement, Compass worked pursuant to a veritable partnership with Reddi in advertising and selling the Damaged Home, thereby giving rise to liability of all of Reddi, Compass, and the Reddi-Compass partnership for the actionable activity, omissions, fraud, and other unlawful conduct of each of the other partner and the partnership itself. <u>See</u> *infra* ¶ 6(b)(quoting Compass FaceBook Video (on-line as of the date of this filing at facebook.com/watch/?v=723774892667769)).

4. Defendant COMPASS GREATER NY, LLC ("**Compass**" or "**Broker**")[2] is a limited liability corporation incorporated

[2] Consumer contacted Compass prior to the filing and service of the complaints and noted that Compass may be omitted from the complaints if Compass, *inter alia*, swore under oath that it knew nothing of Seller's fraudulent statements and had no reason to suspect her statements were fraudulent or that the house's condition was not in the condition falsely represented in the listing and the New York State Property Disclosure Statement that Compass provided to Consumer. **Tellingly, Compass did not agree to do so,**

in Delaware with its headquarters and principal office in Westchester County at 2 Ashford Avenue, Dobbs Ferry, NY 10522 that is licensed by New York State to provide real estate brokerage services with License Number 10991227355. The number, identity, and citizenship of all Compass's members are not publicly available and currently remain unknown to Buyer. In an abundance of caution and to comply with the Court's May 1, 2026 Order, Buyer made multiple requests to Compass prior to filing this amended complaint to ascertain whether any one, more, or all of its Members are citizens of Wyoming such that complete diversity would not exist and subject matter jurisdiction would consequently be absent herefrom. **Buyer informed Compass that it may be dismissed from the action in the event it indicated any one, more, or all of its Members are in fact Wyoming citizens**, but Compass made no such assertion. In the event Compass were to now indicate otherwise, Buyer will immediately take action such as dismissing Compass from the action.

5. Compass, upon information and belief, was aware, or should have been aware of serial-fraudster Seller's

---

**Compass failed to deny that it had acted in concert with Seller to provide the knowingly false New York State Property Condition Disclosure Statement**, Compass failed to deny that it had repeatedly acted in concert with Seller to understate the Damaged Home's property taxes by *tens of thousands of dollars*, Compass failed to perform an investigation, Compass refused to provide relevant communications, Compass chose not to view the damage, Compass criticized Consumer for "welcoming a dialogue" pre-litigation with a knowledgeable law firm and Compass's in-house counsel then concluded that Compass would sue for its costs.

fraudulent statements and activity detailed herein and yet Compass nevertheless permitted—and *partnered*[3] *with*—Seller to utilize Compass's advertising and sales transaction facilities in order to earn hundreds of thousands of dollars, or approximately $187,250.00, in commissions from Seller's fraudulent sale detailed herein. Compass, moreover, upon information and belief, had actual, constructive, and/or inquiry notice of Seller's fraudulent history, activities, concealment, cover up, and scheme.

6. Defendant ARI J. LeFAUVE ("**Director**" or "**Mr. LeFauve**")[4] is an adult male who participated in the claims detailed herein as Senior Managing Director of Compass and a New York State licensed real estate broker with License Number 10301216343, pursuant to which he, upon information and belief and as detailed herein, personally perpetrated

---

[3]See *infra* ¶ 6(b).

[4]Consumer contacted Director's presumed attorney (who already represented Compass) prior to the filing and service of the first amended Complaint and noted that Director may be omitted from the amended Complaint if Director, *inter alia*, swore under oath that he knew nothing of Seller's fraudulent statements and had no reason to suspect her statements were fraudulent or that the house's condition was not in the condition falsely represented in the listing and the New York State Property Disclosure Statement that Director provided to Consumer. **Tellingly, Director did not agree to do so, Director failed to deny that he had acted in concert with Reddi and Compass to provide the knowingly false New York State Property Condition Disclosure Statement**, Director failed to deny that he had repeatedly acted in concert with Seller and Compass to understate the Damaged Home's property taxes by *tens of thousands of dollars*, Director failed to perform an investigation, Director refused to provide relevant communications, and Director chose not to view the damage.

the actionable conduct as part of a concerted scheme with Seller and Compass, specifically personally directing, approving and ratifying the actionable conduct detailed herein including covering-up, plastering, and painting over affected areas of the Damaged Home to prevent discovery of the water infiltration and damage and personally engaging in communications with Buyer in furtherance of the scheme, personally guiding and repeatedly directing Compass's agent who then communicated the specified statements, omissions, and fraud to Buyer, and financially benefitting from the conduct as apparent Director, employee, owner and/or Member of Compass.

a. Director, upon information and belief, was aware, or should have been aware, of serial-fraudster Reddi's fraudulent statements and activity detailed herein and yet Director and Compass nevertheless permitted Seller to utilize Compass's advertising and sales transaction facilities in order to earn hundreds of thousands of dollars, or approximately $187,250.00, in commissions from Reddi's fraudulent sale detailed herein. Director, moreover, upon information and belief, had actual, constructive, and/or inquiry notice of Seller's fraudulent activities, concealment, cover up, and scheme. ***But neither Director nor Compass ever informed Buyer of the fraudulently covered-up water infiltration and damage.***

b. **"Compass Concierge." FaceBook Video of Director's Blue-Print for Fraudulent Concealment & Cover-Up**

Director and Compass are so brazen as to boast of their "truly unique" stratagem in the home brokerage industry of apparent cover-up and concealment. Director personally details the Compass blue-print for obtaining sellers and Compass the highest sales prices and commissions, respectively, which program is called the "Compass Concierge" program. Director details this repeated course of conduct in an on-line video as, *inter alia*, effecting a veritable partnership between Compass and sellers to make strategic applications of "paint" as needed throughout the house in an apparent effort to ensure that prospective buyers and inspectors will be unable to detect, *inter alia*, such cover-up painting and other fraudulent concealment activities. Compass, moreover, evidently admits to generously providing *unlawful interest-free loans* to sellers for the right to jointly perpetrate that fraud. See Compass FaceBook Video (on-line as of the date of this filing at facebook.com/watch/?v=723774892667769).

c. **Vicarious Liability**: While it is publicly unknown whether LeFauve is only a Senior Managing Director of Compass or also an owner or controlling "Member" thereof, Director's actions detailed herein may impose vicarious liability on Compass in addition to Compass's own principal liability contingent on LeFauve's precise relation to Compass and whether Compass authorized, ratified, and/or perpetrated deliberate indifference of his string of unlawful and fraudulent actions complained of herein.

7. At all times herein, Compass's agent regularly referenced that she "ha[d] to check with Ari" LeFauve to get approval for myriad actions because Compass's agent actually was serving both Buyer and Seller in her permitted role as a dual agent by which she represented both sides of the Damaged Home's prospective and actual purchase during its marketing, purchase negotiation, sale, and post-sale communications regarding the concealed water infiltration and damage.

8. Director currently resides at 8 Rittenhouse Road, Bronxville, New York, which is the only publicly available indicia of his ownership of real property throughout the country and apparently is registered to vote in New York. Despite Director having placed his residence for sale on the Multiple Listing Service—**only *after* the original Complaint in this action was filed**—in an apparent attempt to evade rightful judicial and financial accountability for the actions detailed herein,[5] Director remains a citizen of New York; in an abundance of caution and to comply with the Court's May 1, 2026 Order, however, Buyer made multiple requests to Compass's attorney prior to filing the first

[5]Consistent with Director's apparent ongoing effort to flee legal accountability, Director's presumed attorney, Cristina Yannucci (who was representing Compass and thereby received the First Amended Complaint via the Court's CM/ECF system) refused even to respond to Buyer's request that Director waive formal service of the First Amended Complaint. Director had thereby successfully interposed yet another procedural (and financial) hurdle to Buyer's committed quest for justice. Ms. Yannucci, moreover, refused even to file a notice of appearance for Director until nearly a week ***after*** Buyer had already wasted time, money, and effort to serve him. See ECF Doc. No. 44.

amended complaint to ascertain whether Director is a citizen of Wyoming such that complete diversity would not exist and subject matter jurisdiction would consequently be absent herefrom. Buyer informed Compass's attorney that Director may be dismissed from the action in the event he is in fact a Wyoming citizen, but Compass's attorney made no such assertion. In the event Director were to now indicate he is a Wyoming citizen, Buyer will of course immediately take action such as dismissing Director from the action.

9. Seller, Compass, and Director are collectively referred to herein as "**Company**" or "**Defendants**."

10. Buyer brings this action to seek compensatory and equitable relief caused by Defendants' fraudulent activity in successfully soliciting the sale of a ***mold-infested residential real property*** located in Bronxville, New York 10708 (the "**Damaged Home**") for $5,350,000 as a vacation home and art gallery that had been owned by Seller, who had contracted, and partnered with,[6] with Compass as her real estate broker for marketing and sales transaction purchases.

11. Defendants' concerted fraudulent activity effected a $5,350,000 sale and a commission for Compass and Director of approximately $187,250.00 for a newly-constructed but mold-infested Damaged Home that had remained unsold for seven years, experienced repeated price drops, and witnessed the departure of a succession of prior

---

[6] See *supra* ¶ 6(b).

brokerage companies who undoubtedly wanted no part of an apparent fraudulently marketed Damaged Home by an owner with Seller's readily available public history as a serial fraudster as detailed herein.

## JURISDICTION AND VENUE

12. This Court has jurisdiction over the subject matter of this action under 28 U.S.C. section 1332 in that the matter in controversy exceeds $75,000.00 and Consumer is a citizen of Wyoming while, as noted above, upon information, belief, and repeated unanswered requests to Defendants, no one, more, or all Defendants are Wyoming citizens. In the event that any one, more, or all Defendants now divulge Wyoming citizenship, Buyer will take immediate action such as dismissing the identified Defendant(s) so as to obviate motion practice and needless invocation of the Court's attention thereto.

13. Venue is proper in the Southern District of New York pursuant to 28 U.S.C. section 1391(a)(2) in that a substantial part of the events or omissions giving rise to the claims referenced herein occurred in and/or were targeted to cause damages in this District where Compass maintains its headquarters, Seller and Director currently reside in this District, and the Damaged Home is located in

this District. This Court also has jurisdiction over Compass and Director in this action because Compass and Director continually market real properties to New York residents in this District.

**PARTIES**

14. Plaintiff ("**Buyer**") is an adult Senior Citizen male who is a victim of a cerebral vascular accident (commonly referred to as a "stroke") and was repeatedly solicited by Company while in New Jersey by telephone, text, electronic mail, and Internet listings and advertising to come to New York and purchase the Damaged Home where he had never previously owned real property.

15. Defendant TANU REDDI ("**Seller**") reportedly invests in real estate and also served as the *de facto* general contractor of the Damaged Home, which reportedly involved her alienating at least three architects and countless electricians before finding someone who would agree to work with her on the Damaged Home.

16. Defendant COMPASS GREATER NY, LLC ("**Broker**") is a real estate brokerage company that bills itself as the "#1 brokerage" in the United States. Compass facilitated Reddi's fraud by partnering with Reddi and enabling Reddi to utilize Compass's vaunted marketing and sales transaction mechanisms to effect the solicitation and ultimate sale of the Damaged Home. Compass represented Reddi in the sale, and prospective sale, of the Damaged

Home for years and had been in the Damaged Home many times during their longstanding relationship.

a. Significantly, the Damaged Home was never lived in and was accessible solely to Reddi and her agents.

17. Defendant ARI J. LeFAUVE ("**Director**") is a Senior Managing Director of Compass and may be an owner and/or controlling Member of Compass, which is a limited liability company. Upon information and belief, Compass may have authorized and/or ratified the actions taken by Director complained of herein.

18. At all times herein mentioned, Seller, Compass, and Director collectively, and each of them individually, was an agent or joint venturer of each of the other, and in doing the acts alleged herein, were acting within the scope of such agency as they all financially benefitted from the fraudulent sale of the Damaged Home. Each Defendant had actual and/or constructive knowledge of the acts of each of the other Defendants, and ratified, approved, joined in, acquiesced and/or authorized the wrongful acts of each co-Defendant, and/or retained the benefits of said wrongful acts.

19. Defendants, and each of them, aided and abetted, encouraged and rendered substantial assistance to the other Defendants in committing the wrongful acts alleged herein. In taking action, as particularized herein, to aid and abet and substantially assist the commission of these wrongful acts and other wrongdoing complained of, each of the Defendants acted with an awareness of its primary

wrongdoing and realized that its conduct would substantially assist the accomplishment of the wrongful conduct, wrongful goals, and wrongdoing.

20. At all times herein mentioned, Defendants conspired by means of mutual understanding, either expressly or impliedly, among themselves and others in engaging and/or planning to engage in the activities detailed herein to accomplish the wrongful conduct, wrongful goals, and wrongdoing.

**FACTUAL ALLEGATIONS**

21. Consumer was solicited by Company in or about 2025 and 2026—by telephone, electronic mail, text messaging, advertising, and Internet listings from Compass's agent who showed the property to Buyer—to purchase residential real estate located in the Southern District of New York that had previously (unbeknownst to Buyer, an experienced purchaser and seller of real property throughout the country, (see **Exhibit 4**), and his nationally recognized inspector) suffered, *inter alia*, extreme water infiltration, seepage, and damage and retained the unsanitary, structurally defective, and deteriorating *sequela* of such damage including, *inter alia*, extensive "black mold," and buckled flooring. See Photographs of "black mold" in the Damaged Home that is now visible after professionals' have broken open the interior areas of the home to expose the infrastructure in order to determine the cause of the damage, repair the damage, and prevent

recurrence of the damage (**attached hereto as <u>Exhibits 1 & 2</u>**).

22. As Seller already has publicly admitted in the instant action, she knowingly fraudulently disclaimed knowledge of water infiltration and damage in the Damaged Home that ***Seller exclusively owned and controlled*** from its construction through its sale to Buyer on March 4, 2026.

23. Compass and Director, upon information and belief, were aware of Seller's fraud or should have known of her fraud as Compass and Director refused to deny otherwise as detailed above.

24. Seller's filings already have admitted the gravamen of the complaints' claims—***and even presented the veritable smoking gun***: Seller submitted to the Court the New York State Property Condition Disclosure Statement, dated January 12, 2026, on which she fraudulently disclaimed knowledge of water damage in the residence that she ***had exclusively owned and controlled with Co-Defendant Compass Greater New York, LLC*** ever since she served as general contractor during construction thereof despite evident concealment activity perpetrated thereat. <u>See</u> Decl. of Seller Counsel, Apr. 29, 2026, Exh. 5, at 4 (ECF Doc. No. 17-5); Compl., Mar. 16, 2026, ¶ 18 (ECF Doc. No. 2).

25. Seller, Director, and Compass authorized Compass's agent to electronically mail the fraudulent New York State Property Condition Disclosure Statement to Buyer, which was sent on January 13, 2026 from Seller's

attorney to Buyer's attorney on that date to induce purchase of the Damaged Home by knowingly falsely stating its condition.

26. Defendants intended that Buyer would rely on the fraudulent statements to either (i) buy the Damaged Home when he otherwise would not, or (ii) buy the Damaged Home at a higher price than he otherwise would, e.g., Buyer would have understandably been expected to demand that the hidden water damage and infiltration be explained, remedied, and precluded from recurrence as a condition to purchasing the Damaged Home. Buyer reasonably relied on Defendants' fraudulent statements and retained a nationally known inspector who also did not detect Defendants' fraud, concealment, and cover-up relating to the water infiltration and damage.

27. Evidence of Seller's concealment activity is noted in the attached magnified and strongly lit photograph that shows areas, *inter alia*, where a baseboard and wall had been opened, closed, and then covered-up with, *inter alia*, added plaster and new paint. See **Exhibit 3** (**magnified and strongly lit photograph attached hereto**).

28. Magnification and strong lighting of the area had been indicated after nearby floor buckling was detected while laying down a rug in the subject room two days after purchase of the Damaged Home while wearing stockinged feet, which prompted Buyer to retain professionals to investigate the cause of the buckled flooring.

a. Compass and Director knew or should have known of Seller's fraudulent disclaiming of water damage and infiltration and Seller's fraudulent concealment of the water damage and infiltration as Compass and Director had active, constructive, and inquiry notice thereof.

b. Compass and Director apparently advised Seller —pursuant to their Compass Concierge partnership and scheme to strategically "paint" subject areas of the Damaged Home— to knowingly falsely state on the New York State Property Condition Disclosure Statement that she had no knowledge of water infiltration and damage because it was extremely unlikely that the water infiltration and damage would manifest itself unless walls and ceilings were broken open. Evidently, none of Compass, Director, nor Seller anticipated that Buyer would detect the fraud simply by walking with stockinged feet to lay down a rug on the affected buckled flooring that was not visually or otherwise detectable.

29. Further inquiry by professionals has lead to discovery of, *inter alia*, the aftermath of significant and undisclosed water infiltration, seepage, damage, and "black mold" growth, which has necessitated the ongoing cutting open of successive walls and ceilings to discover and remove, *inter alia*, bagfuls of wet and moldy insulation and wet, moldy, and rotted medium density fiberboards ("**MDFs**") from the infrastructure. This has necessitated retention of additional mold-removal, plumbing, and heating, ventilation, and air conditioning ("**HVAC**") personnel in an

expensive effort to "reverse engineer" the etiology of the water infiltration (which may occur uniquely during cold exterior temperatures when the heating mechanism is fully engaged) by this "exploratory surgery" of destroying interior walls, floors, and ceilings in order mitigate and remediate the damage and prevent its recurrence—*all of which could be avoided if Defendants simply provided the information in their possession.* See, e.g., **Exhibit 7** (photograph showing additional destruction of new portion of the interior as needed to access suspected HVAC leak).

a. While recent discoveries suggest some HVAC-related cause—at least in part—to the water infiltration, Seller apparently also has arranged for the HVAC professional who serviced her investment property ***to refuse to provide any information to Buyer*** concerning the etiology of the infiltration and any ameliorative and cover-up activity that occurred thereat. Again, Seller thereby needlessly increases the time, effort, and expense to reach a resolution as the HVAC professional will accordingly need to be subpoenaed upon commencement of discovery.

30. Due to Defendants' conduct, Buyer has had to spend money on professionals' investigative and reparative work and is continuing to pay for professionals to comprehensively ascertain the etiology of the damage, mitigate the damage, and prevent recurrence of the damage.

a. If Defendants had disclosed the water infiltration and damage before purchase, Buyer would have engaged professionals to examine the reported areas of the

Damaged Home to ascertain the extent of the infiltration and damage in order to evaluate whether to refrain from purchasing the Damaged Home, requiring the Seller to make specified repairs as a condition of making the purchase, and/or pursuing alternative options instead of buying the Damaged Home for $5,350,000 as subsequently occurred due to, *inter alia*, Defendants' fraud.

31. Buyer also must move belongings out of the areas that have, to date, been identified as mold-infested, keep away from those areas, and keep infrastructure of the home exposed because professionals cannot "close" the open areas until the full extent of the damage is ascertained and water infiltration and mold growth completely arrested, remediated, and precluded from recurring.

32. The full extent of the damage remains unknown as professionals must continue to "break open" the other multiple layers of floors, walls, ceilings, and baseboards to assess the extent of the damage, attempt to identify the origin of the damage, attempt to remediate the damage, and attempt to prevent recurrence of the cause of the damage.

33. Because the extent of the damage remains unknown, Buyer may need to seek the rescission of the sale and must now move belongings out of portions of the Damaged Home and must spend time in the Damaged Home with gaping holes of exposed infrastructure during the professionals' work on the Damaged Home to ascertain if it can be salvaged or if the black mold and other damage have spread throughout such

that a "tear down" of the Damaged Home may be the only economically feasible course of action.

34. Unbelievably, the Defendants continue to compound the damages by refusing to respond to Buyer's inquiries regarding the origin of the damage, which information would be invaluable in mitigating damages where possible, repairing all damage, and precluding recurrence of the damage, e.g., WHAT caused the water damage (rain, ice, leaking roof, burst pipe, faulty pool equipment?), WHEN did the incident(s) occur (in December 2025 or in October 2021, which would suggest that a multi-year spread of mold already has occurred?), had any remedial efforts been taken (roof patching, pipe replacement, wall replacement?), or had only a deliberate attempt to conceal and cover-up been perpetrated as indicated by subsequently applied paint and plaster to part of the affected area, *et al.*?

35. Instead, as detailed herein, Seller has provided no response whatsoever and Compass and Director failed to view the damage and instead threatened to sue Buyer for their costs if Buyer pursued a remedy for his damages.

36. Significantly, although Defendants are aware that Buyer is a Senior Citizen stroke survivor who suffers ***(i) medically treated respiratory difficulties and (ii) an allergy to mold,*** Defendants continue to refuse to provide any of the needed information as of the date of filing of this second amended complaint.

37. As noted above, Seller had knowingly falsely certified that no such occurrence nor condition had taken

place nor existed in the required New York State Property Condition Disclosure Statement that Compass and Director knew was legally required to be provided to Buyer in solicitation of the Damaged Home's sale.

38. Seller, Compass, Director, and/or agent(s) had affirmatively concealed the damage with, *inter alia*, paint, plaster, and other materials such that a nationally recognized home inspector did not notice the fraud on his visit to the house.

a. Defendants had a common law duty to inform Seller of the water infiltration and damage, but knowingly refrained from informing Buyer of the water infiltration and damage while aware that Buyer and his inspector would not detect that water infiltration and damage—which information absolutely would have been material to Buyer's decision to consummate the purchase of the Damaged Home as contracted—due to Defendants' fraudulent concealment and cover-up of the activity Defendants took to prevent Buyer from discovering same by adding, *inter alia*, same colored plaster and similarly-colored paint to the affected baseboard and wall. See **Exhibit 3** (**magnified and strongly lit photograph attached hereto of the cover-up**).

39. Seller, Compass, and Director compounded their fraud by rejecting Consumer's multiple communications and efforts over months to mitigate damages by ***refusing to provide*** Consumer with any history or detail of the water penetration, damage, seepage, mold growth, and other conditions regarding the Damaged Home, which information

could facilitate, expedite, and lessen the expense of comprehensively responding to, remediating, and preventing recurrence of the actions and conditions that had not been disclosed as mandated by Company on, *inter alia*, New York State's Property Condition Disclosure Statement and pursuant to the tort of common law fraud.

40. Reddi's response was, and continues to the date of filing, to be silence except through recent legal filings in the instant action, which also provide none of the needed information.

41. Defendants also fraudulently marketed the Damaged Home by knowingly falsely *understating* the Damaged Home's property taxes by tens of thousands of dollars. All of Seller, Compass, and Director publicly advertised the property on the Internet, the real estate industry's Multiple Listing Service, and other media at all times relevant herein as subject to property taxes of only $62,000 when the actual amount was nearly 20% greater.

42. Seller & Compass nevertheless knowingly falsely denied their fraudulent statement on January 8, 2026; even worse, Defendants continued to fraudulently market the Damaged Home by ***continuing to understate*** the property taxes in the advertising ***after*** *Defendants were advised in writing of the fraud.* Defendants thereby continued to fraudulently market the Damaged Home to render it more desirable in their concerted effort to obtain a larger sales price and commission for themselves.

43. Defendants were then so brazen as to subsequently remove the listing entirely from national databases and then re-list it anew on January 20, 2026 while again ***continuing to knowingly fraudulently understate*** the property taxes as only $62,000.

44. The multiple instances of concerted fraudulent activity amongst Reddi, Compass, and Director demonstrate the evident cooperation in their repeated, ongoing, vast, and shameless fraudulent efforts to obtain *and retain* the $5,350,000 purchase price—and a shared commission for Compass and Director of approximately $187,250—for a mold-infested Damaged Home that had remained unsold for seven years and experienced repeated price drops and the fleeing of multiple ethical real estate brokers who presumably wanted no part of a fraudulent sale.

**COMPASS AND DIRECTOR WERE AWARE OF SELLER'S FRAUDULENT PATTERN OF CONDUCT, WHICH APPARENTLY INCLUDED SELLER'S DEFRAUDING THE CITY OF YONKERS BY TENS OF THOUSANDS OF DOLLARS ANNUALLY BY *KNOWINGLY FALSELY STATING SHE LIVED IN THE DAMAGED HOME***

45. Publicly-available court filings suggest that Reddi had previously been a party to allegedly fraudulent real estate transactions with multiple properties in the amount of $3,000,000.00 allegedly related to attorney Diosdado C. Sebrio, Jr.

46. Compass and Director, of course, were on constructive and inquiry notice and likely had actual notice of the publicly-available court filings suggesting that Reddi had previously been a party to allegedly

fraudulent real estate transactions with multiple properties in the amount of $3,000,000.00 allegedly related to attorney Diosdado C. Sebrio, Jr.

### a. **Seller Defrauds the City of Yonkers of Tens of Thousands of Dollars Annually**

Defendants proudly and truthfully marketed the Damaged Home by informing prospective buyers that it had never served as a residence for anyone, including Seller. Compass gave tours of the Damaged Home and eagerly pointed out the resulting absence of wear-and-tear (despite the house's age of approximately seven years) and how the various appliances had never been used and thereby retained their respective instruction manual and blue stabilizing tape that kept the associated drawers, compartments, shelves, and other internal components from shifting during delivery. Compass explained that the Damaged Home accordingly also had no doorbell nor mailbox, because the Seller in fact lived in a "double-wide" in the neighborhood at 2 Oak Bend in Bronxville as apparently confirmed by voter registration, driver license, automobile registration, and dental license records. The neighborhood letter carrier of the U.S. Postal Service further confirmed that no delivery of mail had ever occurred to the Damaged Home. But Compass assured prospective buyers that the vacant Damaged Home was nevertheless maintained by Seller who would take daily walks in the neighborhood from her actual residence, which is nearby, to regularly flush toilets, remain alert for squatters, and confirm that

gardeners kept the lawn mowed so as to maintain its appeal to prospective buyers. Despite Seller not residing in the Damaged Home—as also universally confirmed by residents of neighboring homes—records for the City of Yonkers (in which jurisdiction the Damaged Home sits despite its "Bronxville" U.S. Postal Service address), indicate that ***Seller defrauded Yonkers of tens of thousands of dollars annually*** (see **Exhibit 5** (City of Yonkers Assessor letter, Apr. 16, 2026) ***by falsely claiming the Damaged Home was her residence.*** See City of Yonkers Code Art. III, § 15-35(D) (providing that the "Real Property Tax Exemption" that Seller fraudulently obtained is solely available where the subject "real property is the legal residence of and is occupied" by the owner).

47. Publicly-available information on the Internet regarding Reddi's purported treatment of others in financial activities ***before*** Compass partnered[7] with, and agreed to provide, Reddi access to Compass's marketing and sales mechanisms included, *inter alia*, an individual who said of Reddi,

> Racist much ?? When I was referred to them I called for an appointment , after given my last name ( Puerto Rican) I was asked .umm.. " do you even have insurance? " yes I do actually , through my TEAMSTER UNION benefits. They hold on and came back and said ya we don't take that , asked then why was a referred to them from a place that does . And again "hold on" then [**presumably Defendant TANU REDDI**] broke through the line

[7] See *supra* ¶ 6(b).

> as if she was listening the whole time and yelled ya we don't take any of that kind !! Nothing ! Ok gues they don't like Hispanics or blue collar union men And women! Reading the reviews glad I didn't go see her .. looks like a real fun time ! Gtfo with ya attitude lady !

Other posted reviews detail an alleged pattern of behavior demonstrating that Seller's *modus operandi* may be to demand money first, provide shoddy work, and then rebuff pre-litigation efforts to resolve concerns by simply failing to respond; in one case, she reportedly simply challenged her patient to go ahead "and sue me" to obtain any information or a remedy. Such repeated racist, immoral, and illegal actions constitute "bad acts" that are of course relevant as to the issue of Reddi's credibility and whether she *intended* to perpetrate specified activities as her actions were part of a common practice or plan, or *modus operandi*, and therefore entirely admissible pursuant to the Federal Rules of Evidence. See Fed. R. Evid. 404(b)(2)(providing that such "evidence may be admissible for . . . proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident"); Fed. R. Evid. 608(b)(1)("The court may, on cross-examination, allow ["bad acts" and wrongs] to be inquired into if they are probative of the character for truthfulness or untruthfulness of the witness . . . ."); see also Fed. R. Evid. 405(b). And, significantly, Reddi already has herself explicitly acknowledged the importance of credibility in the Court's resolving this action. See

Seller's Mem. L. Supp., Apr. 29, 2026, at 8 (ECF Doc. No. 19).

a. One customer shared, "After treatment Dr. Reddi ignored messages to communicate with my dentist to complete the work, She never returned calls which will have an impact on my present care."

b. Another customer recounted that "Dr. Reddi almost killed me. Wouldn't answer my calls during extreme pain . Sealed up an infection on me and Next thing I knew I was in ICU with swelling so severe that it was closing off my throat! Heartless....and ***They would 't refund my insurance money until I threatened to sue.*** STAY AWAY!!" (emphasis added).

c. Yet another customer explained, "Have never been treated so poorly by a Doctor. Dr. Reddi called me morning of my emergency appointment to cancel it, after I had taken day off work to see her. No apology. Just said she was getting ready for vacation for the holidays. She was very angry at me for being upset that she called me 3 hours before I was to see her and would not listen to a word I said, rather just yelled and then HUNG UP. Frightful. My family will not be back."

d. Another customer detailed, "If you like to loose your money and tooth choose this doctor. She is the worst doctor I have ever seen. No professionalism . She runs from one patient to the other without finishing the work, leaving you in the middle of the procedure. I went to do the root canal because of pain on one of my tooth . I had

to come back with the same pain of the same tooth and she said everything is ok.After couple of months that tooth came out.when asked about it she was verbally threatening and rude. Horrible."

48. Consumer, as detailed *supra* footnote two, contacted Compass prior to the filing and service of the Complaints and noted that Compass may be omitted from the Complaints if Compass, *inter alia*, swore under oath that it knew nothing of Reddi's fraudulent statements and had no reason to suspect her statements were fraudulent or that the house's condition was not in the condition falsely represented in the listing and the New York State Property Disclosure Statement that was provided to Consumer. **Tellingly, Compass did not agree to do so, Compass failed to deny that it had acted in concert with Reddi to provide the knowingly false New York State Property Condition Disclosure Statement**, Compass failed to deny that it had repeatedly acted in concert with Reddi to understate the Damaged Home's property taxes by *tens of thousands of dollars*, Compass failed to perform an investigation, Compass refused to provide relevant communications, Compass chose not to view the damage, Compass criticized Consumer for "welcoming a dialogue" pre-litigation with a knowledgeable law firm, and Compass's in-house counsel then concluded that Compass would sue for its costs. Director was personally involved in these communications and served as a decisionmaker as to what response, if any, would be provided to Buyer in Buyer's effort to mitigate damages,

repair the existing damage, and prevent recurrence of the damage by identifying the damage's etiology.

**NEW JERSEY'S CONSUMER FRAUD ACT PROVIDES FOR TREBLE DAMAGES, ATTORNEYS' FEES, AND MULTIPLE PENALTIES OF $30,000.00 FOR EACH VIOLATION**

49. The New Jersey Consumer Fraud Act, N.J.S.A. 56:8-2.2 et seq. ("**NJCFA**")) provides for, *inter alia*, treble damages, attorneys' fees, penalties of $10,000.00 for the first violation and $20,000.00 for the second and every subsequent violation, and *enhanced damages for violations perpetrated against Senior Citizens and/or persons suffering from a disability including a $30,000.00 penalty for a scheme perpetrated against such vulnerable consumers*. Consumer is a Senior Citizen and receives medical care following his cerebral vascular accident, or "stroke," which he suffered in 2011 prior to all of the facts detailed herein, and, significantly, suffers from ***(i) medically treated respiratory difficulties and (ii) an allergy to mold.***

**AS AND FOR A FIRST CAUSE OF ACTION**

**(Violation of New Jersey Consumer Fraud Act, N.J.S.A. 56:8-2.2 et seq. ("NJCFA"))**

50. Consumer repeats and realleges each and every allegation set forth above as if fully set forth herein.

51. Defendants violated the NJCFA by, *inter alia*, fraudulently soliciting and effecting the sale of the Damaged Home by advertising the Damaged Home in New Jersey and telephoning, texting, and sending electronic mail messages to Buyer in New Jersey in an effort to solicit his purchase of the Damaged Home.

52. The NJCFA protects consumers present in New Jersey from the prohibited conduct of soliciting consumers while in New Jersey to transact improper sales *regardless of where the ultimate sale may be effected*.

a. The New York State Association of Realtors Code of Ethics, in conformity with this comprehensive protection of consumers, specifically provides that "[t]he duties imposed by the Code of Ethics encompass all real estate-related activities and transactions ***whether conducted in person, electronically or through any other means***." Code of Ethics Standard of Practice 1-2 (emphasis added).

53. Defendants also continue to violate the NJCFA by continuing to refuse to respond to Consumer's multiple requests arising from the Damaged Home Sale to remedy the damage and prevent recurrence thereof.

54. NJCFA provides for, *inter alia*, treble damages, attorneys' fees, penalties of $10,000.00 for the first violation and $20,000.00 for the second and every subsequent violation, and enhanced damages for violations perpetrated against Senior Citizens and/or persons suffering from a disability, which includes a $30,000.00 penalty for a scheme perpetrated against such vulnerable consumers.

55. Plaintiff is a Senior Citizen who suffered a cerebral vascular accident in 2011 and has been receiving medical treatment for his "stroke" and respiratory difficulties prior to all the facts detailed herein.

56. NJCFA imposes personal liability[8] upon individuals who violate the statute notwithstanding their having purported to contract solely in a corporate entity's name.

57. Consumer also seeks injunctive relief against Defendants ***requiring them to provide all information in any form whatsoever regarding the occurrence of all water penetration and damage and repair and concealment thereof that occurred on and in the Damaged Home, rescission of the contract, and disgorgement of the fraudulently obtained $5,350,000.00 purchase price.***

## SECOND CAUSE OF ACTION
## (FRAUD)

58. Consumer incorporates and realleges, as though fully set forth herein, each of the paragraphs above.

59. Company's knowingly and deliberately fraudulently solicited the sale of the Damaged Home.

60. Plaintiff reasonably relied on Company's false statements and omissions by purchasing the Damaged Home.

a. Defendants had a common law duty to inform Seller of the water infiltration and damage, but knowingly

[8] Gearing v. Wei chert Co. Realtors, 148 N.J. 582 (1997).

refrained from informing Buyer of the water infiltration and damage while aware that Buyer and his inspector would not detect that water infiltration and damage—which information absolutely would have been material to Buyer's decision to consummate the purchase of the Damaged Home as contracted—due to Defendants' fraudulent concealment and cover-up of the activity Defendants took to prevent Buyer from discovering same by adding, *inter alia*, same colored plaster and similarly-colored paint to the affected baseboard and wall. See **Exhibit 3** (**magnified and strongly lit photograph attached hereto of the cover-up**).

61. ***Company's wrongful behavior continues to the present*** as it continues refusing to provide Consumer with the information needed to address the damages and mitigate, if possible, those damages.

62. Plaintiff has been damaged thereby.

**THIRD CAUSE OF ACTION**
**(VIOLATION OF N.Y. GEN. BUS. LAW § 349: DECEPTIVE ACTS AND PRACTICES)**

63. Consumer repeats and realleges each and every allegation set forth above as if fully set forth herein.

64. Company knowingly and deliberately fraudulently solicited the sale of the Damaged Home.

65. Plaintiff reasonably relied on Company's representations and omissions by purchasing the Damaged Home.

66. Plaintiff has been damaged thereby.

67. Statute provides for payment of up to three times actual damages per violation.

68. Statute provides for award of attorneys' fees.

69. Consumer also seeks injunctive relief as detailed herein.

**FOURTH CAUSE OF ACTION**
**(VIOLATION OF N.Y. GEN. BUS. LAW § 350: FALSE ADVERTISING)**

70. Plaintiff repeats and realleges each and every allegation set forth above as if fully set forth herein.

71. Statute provides for payment of up to three times actual damages.

72. Statute provides for award of attorneys' fees.

73. Consumer also seeks injunctive relief as detailed herein.

**FIFTH CAUSE OF ACTION**
**(BREACH OF CONTRACT)**

74. Plaintiff incorporates and realleges, as though fully set forth herein, each of the paragraphs above.

75. As a result of Company's breach of the agreement to truthfully disclose the actual condition of the Damaged Home, Consumer purchased the Damaged Home and suffered damages thereby.

**SIXTH CAUSE OF ACTION**
**(BREACH OF CONTRACTUAL DUTY OF GOOD FAITH AND FAIR DEALING)**

76. Plaintiff incorporates and realleges, as though fully set forth herein, each of the paragraphs above.

77. As a result of Company's ongoing breach of the contractual duty of good faith and fair dealing that requires Company to provide Consumer with the information needed to address the damages and mitigate, if possible, those damages, Consumer has suffered, and continues to suffer, damages.

**SEVENTH CAUSE OF ACTION**
**(NEGLIGENCE)**

78. Plaintiff incorporates and realleges, as though fully set forth herein, each of the paragraphs above.

79. Company failed to exercise the duty of care owed to Consumer by failing to truthfully inform him of the actual condition of the Damaged Home.

80. Company also failed to exercise the duty of care owed to Consumer by failing to provide him the information needed once Consumer discovered the damage, which information would facilitate Consumer's efforts to mitigate damages if possible: Company refuses to respond to state, e.g., WHAT caused the water damage (rain, ice, leaking roof, burst pipe, faulty pool equipment?), WHEN did the incident(s) occur (in December 2025 or in October 2021, which would suggest a multi-year spread of mold already has occurred?), had any remedial efforts been taken (roof patching, pipe replacement, wall replacement?), or had only a deliberate attempt to conceal and cover-up been perpetrated as indicated by subsequently applied paint to part of the affected area?), et al.

81. Consumer was damaged by Company’s negligence and suffered damages detailed herein.

82. ***Company's wrongful behavior continues to the present as Defendants continue to compound the damages by refusing to respond to Consumer’s weeks-long inquiries regarding the origin of the damage.***

83. Plaintiff has been damaged thereby as detailed herein.

**EIGHTH CAUSE OF ACTION**
**(BREACH OF REAL ESTATE BROKER ETHICAL DUTIES TO BUYER)**

84. Plaintiff incorporates and realleges, as though fully set forth herein, each of the paragraphs above.

85. Compass and Director, who are licensed to engage in real estate brokerage services in New York, both breached their respective ethical duties as real estate brokers to Buyer as prescribed by the The New York State Association of Realtors Code of Ethics (“**Code of Ethics**”).

86. Compass and Director knew of and ratified Seller’s and Compass’s agent’s provision of a knowingly fraudulent New York State Property Condition Disclosure Statement as detailed herein in abject violation of the Code of Ethic’s prohibition of “***concealment of pertinent facts*** relating to the property.” Code of Ethics Art. 2 (emphasis added).

87. Compass and Director also participated in Seller’s and Compass’s agent’s provision of a knowingly fraudulent understated property tax amount for the Damaged Home as detailed herein in direct contravention of the mandate to “be ***honest and truthful*** in their real estate

communications and [] present ***a true picture in their*** ***advertising, marketing, and other representations . . .*** includ[ing] ***Internet content posted***." Code of Ethics Art. 12 & Standard or Practice 12-10 (emphases added).

88. Consumer was damaged by Compass's and Director's breach of their ethical duties to Buyer and suffered damages as detailed herein.

89. ***Compass's and Director's wrongful behavior continues to the present as they continue to compound the damages by refusing to respond to Consumer's months-long inquiries regarding the origin of the damage.***

90. Plaintiff has been damaged thereby as detailed herein.

**NINTH CAUSE OF ACTION**
**(BREACH OF DUTY TO THIRD-PARTY BENEFICIARY)**

91. Plaintiff incorporates and realleges, as though fully set forth herein, each of the paragraphs above.

92. Seller, Compass and Director each breached their respective explicit and implicit duties under the standard real estate industry listing agreements to third-party beneficiary Buyer, which require Defendants to provide only truthful information to prospective buyers. Defendants breached those duties by perpetrating the actions detailed herein.

93. Compass and Director also breached their respective explicit and implicit duties under the standard real estate industry listing agreements to third-party beneficiary Buyer, which require that Compass and Director assist buyers who have been damaged by false statements

perpetrated by sellers while the sellers utilized Compass's advertising and sales mechanism to effect the fraud that damaged buyers. Compass and Director breached those duties by perpetrating the actions detailed herein, failing to enforce Seller's duties under the subject listing agreements to provide only truthful information to prospective buyers, and failing to provide Buyer the information needed once Buyer discovered the subject damage, which information would facilitate Buyer's efforts to mitigate damages if possible.

94. Company continues to refuse to enforce Seller's duties under the listing agreement to correct her fraudulent statements and inform Buyer of the information needed to address the cause of the fraudulently concealed damage, repair the resulting damage, and prevent recurrence of the damage including, *inter alia*, WHAT caused the water damage (rain, ice, leaking roof, burst pipe, faulty pool equipment?), WHEN did the incident(s) occur (in December 2025 or in October 2021, which would suggest a multi-year spread of mold already has occurred?), had any remedial efforts been taken (roof patching, pipe replacement, wall replacement?), or had only a deliberate attempt to conceal and cover-up been perpetrated as indicated by subsequently applied paint to part of the affected area?), *et al*.

95. Consumer was damaged by Defendants' breach of their duties to Buyer as a third-party beneficiary and suffered damages detailed herein.

96. ***Company's wrongful behavior continues to the present as Defendants continue to compound the damages by refusing to respond to Consumer's months-long inquiries regarding the origin of the damage.***

97. Plaintiff has been damaged thereby as detailed herein.

**TENTH CAUSE OF ACTION**
**(BREACH OF FIDUCIARY DUTY TO BUYER)**

98. Plaintiff incorporates and realleges, as though fully set forth herein, each of the paragraphs above.

99. Compass and Director each breached their respective fiduciary duties to Buyer by their actions, omissions, and fraudulent statements as detailed herein.

100. Compass and Director continue to breach their fiduciary duties to enforce Seller's duties under the listing agreement to correct her fraudulent statements and inform Buyer of the information needed to address the cause of the fraudulently concealed damage, repair the resulting damage.

101. Consumer was damaged by Compass's and Director's breach of their fiduciary duties to Buyer.

WHEREFORE, Plaintiff prays for relief as set forth below.

**PRAYER FOR RELIEF**

1. Compensatory, legal, and equitable relief as detailed herein;

2. Statutory damages including treble damages as prescribed by New York and New Jersey statutes;

3. Compensatory, general, incidental, and consequential damages according to proof;

4. Special damages according to proof;

5. Punitive damages to punish Defendants for their willful illegal and deliberate contract breaches and to deter others who may otherwise engage in similar willful illegal and deliberate conduct;

6. Restitution and disgorgement according to proof;

7. Injunctive relief against Defendants, and each of them, ***requiring them to provide all information in any form whatsoever regarding the occurrence of all water penetration and damage and repair and concealment thereof that occurred on and in the Damaged Home, rescission of the contract, and disgorgement of the fraudulently obtained $5,350,000.00 purchase price: Company's wrongful behavior continues to the present as Defendants continue to compound the damages by refusing to respond to Consumer's inquiries regarding the origin of the damage, which is needed to mitigate damages and assess whether a "tear-down" of the Damaged Home may be avoided.***

8. Prejudgment interest at the maximum legal rate;

9. Costs of the proceedings herein;

10. Reasonable attorneys' fees; and

11. All such other and further relief as the Court deems just and proper, the monetary total of which, less interest and costs, may be greater than three times the purchase price of the Damaged Home, $16,050,000.00, in the event, *inter alia*, rescission, disgorgement, and treble damages are awarded.

Dated: May 28, 2026

Respectfully submitted,

By: /s/_Stephen J. Simoni__

STEPHEN J. SIMONI
StephenSimoniLAW@gmail.com
**SIMONI CONSUMERS CLASS ACTION LAW OFFICES**
c/o Jardim Meisner Salmon Sprague & Susser, P.C.
30B Vreeland Road, Ste. 100
Florham Park, NJ 07932
Telephone: (917) 621-5795

*Counsel for Plaintiff*

## DEMAND FOR JURY TRIAL

Plaintiff requests a jury trial on all claims so triable.

Dated: May 28, 2026

Respectfully submitted,

By: /s/_Stephen J. Simoni__